Mr. Justice Cox
delivered the opinion of the Court:
This was an action brought against the defendant company for a false arrest alleged to have been committed by ■a man in the employ of the company. The facts seem to have been that on the 18th of August, 1888, a lady had her pocket-book stolen just on the-outside of the market. At that time the plaintiff, who was a colored servant in the ■employ of one Mrs. Fisher, was standing with the lady at one of the stands in the market. Somebody informed a man named Capner, -who was an employee of the market ■company, of this robbery, and pointed out this plaintiff as the thief. Capner thereupon handcuffed him and proceeded to take him - to the station; but before he emerged from the building he was informed by a lady who had witnessed the robbery, that he was not the man, and he was thereupon released. Now, there is no doubt this man was perfectly innocent. The lady who lost the pocket-book said she had something over $5 in it, so that the larceny was petty larceny, and under the construction given our statute it was a mere misdemeanor, and there was no sort ■of authority for arresting upon information derived from ■a party who did not profess to have any knowledge upon the subject. There is no doubt that a great outrage upon this poor man was committed, and somebody ought to ■suffer for it; but the only question is, whether this defendant is responsible in law for this proceeding, and that, of course, depends upon the relation of the man who did the wrong to the market company. If the company, through its officers duly representing them, had requested or ordered this arrest, there could be no doubt at all of its responsibility. In fact, we may go further;. if they had generally authorized this man to make arrests in his discretion, they would become responsible for his acts. The company claimed, however, that this man was simply employed *390 there as a collector of the rent for the stalls and had general authority to keep order; that is, regulate places for selling and prevent any disorder, and expel any disorderly person from the market, but had no authority /rom them to make arrests. And they say further, that he was a commissioned police officer, and if he made arrests he made them in that character, and as such he was not their agent, but the agent of the public authorities, and that this arrest is to be assumed to have been made by him in that capacity, and they are not responsible for it. Now, the case comes before us not only upon exceptions but also upon a case, and it becomes important to examine the evidence.
Preston S. Smith says: “ I am clerk of the Center Market, and in August, 1888, was superintendent thereof for the Washington Market Company. William Capner was in the employ of the Market Company. His duties were to collect bills from dealers having stands and from the country people occupying parts of the market grounds. A part of his duty was to see that the regulations of the company were complied with and to keep order in the market. Pie has made arrests and has put people out of the market.”
On cross-examination "he says: “ By the phrase ‘ to keep order in the market,’ I mean that he was to see that things were kept in place and that matters went on smoothly and quietly. I never gave Capner any instructions or authority to make arrests. There is no such instruction in the regulations. I don’t know of any officer of the company ever giving him such instructions. I had an assistant under me who was over Capner. At the time of the arrest in August, 1888, said Capner was a special offices'for the Metropolitan Police. The lieutenant of that ps'ecinct was, I suppose, his superior officer, and he received his police instructions frossi him. Iiis appointment came about as follows: The Washington Market Company made application for a regular police officer to be detailed to duty at the market house, but we could not get *391 one, owing to the small number of officers, and the lieutenant of the precinct suggested that we have our own men appointed special officers. This was agreed to and Capner was appointed a special officer on the recommendation of the lieutenant of the precinct.”
Redirect: “Capner was appointed a special police officer for the market company on the application of the market company. Pie had been in our employ a long time before he was appointed a special officer. Plis duties were to collect rent from persons having stands, and to keep order and to see to things in the market. It was his duty to police the market house. If a disturbance were to occur in the market house it would be his duty to quell it. If it was necessary to make arrests I suppose it would be his duty to make the arrests. I have known him to make arrests in the market house. Under his authority to keep order, I suppose he would be expected to make arrests, if necessary, but about this I don’t know. We expected him to keep order in the market house. I suppose if a disturbance or riot were to occur in the market, Mr. Capner, under his authority to keep order, might be empowered to make arrests, hut about this I don’t know. ' Pie had no instructions tó that effect that I know of.”
Capner himself says: “In August, 1888, I tuas a Special Metropolitan Police Officer on duty at the Center and Wholesale Markets. On that day Mr. Francis IP. Javins came to me at the receiving rooms of the Washington Market Company, where I was at work, and told me that a lady had had her pocket picked and purse stolen, and the man who stole it was then near his stand. I ran over there and Javins pointed out the plaintiff as the thief. I arrested him, putting nippers on his wrists and told him the charge against him. I showed him my police badge, which I wore under my coat. I took him about three feet along the aisle when Mrs. Scroggins came in and said ‘ he is not the man.’ I then released him and apologized for the mistake.”
*392 Cross-examination: “ I was in the employ of the Market Company before I was appointed a Special Metropolitan Police Officer; I have made arrests in the market house, and outside too, for larceny and other offenses against the law. I was instructed by the U. S. Attorney, and by the lieutenant of police, that my right to arrest for crime was as extensive as that of any officer. I am paid by the Washington Market Company, and not by the District of Columbia, except when I make arrests; then I am paid my witness fees. I have made arrests for affrays and for other violations of law coming under my notice, and sometimes for offenses I have been told of, but have not myself witnessed. I have never been instructed by the market company to make arrests, and do not suppose the company knew of such arrests as I have made, as I do not report arrests to them. My duties in the market house is to keep order, collect rents for the stands and attend to the receiving room for cold storage. I collect bills outside of the market as well as inside, and give direction where dealers may stand and what space they can occupy outside of the market building.”
Then there is offered in evidence the commission issued by the Commissioners of the District to Capner, in which it is said : “In exercise of the authority vested in them by law, and reposing confidence in the integrity, ability and judgment of William J. Capner, do hereby appoint him an additional private of the Metropolitan Police for. three years, for duty at Center and Wholesale Market, with all the privileges and authorities of right appertaining to that office, subject to the conditions prescribed by law, without compensation from the District of Columbia.”
The only thing that is relied upon as opposed to this, is some loose conversation with the superintendent immediately after his arrest. Mrs. Fisher went to the superintendent, Smith, and said: “Your man Capner arrested my man for' stealing a pocket-book, and he had no right to arrest him.” The superintendent replied: “Such things will occur and they can’t be helped; Mr. Capner is a careful *393 man and knows his business. It is possible that he went too far.” Mrs. Fisher said he did go too far; that he had no right to arrest him; that he had been in her employ for sixteen years. The superintendent replied : “ Mr. Capner has been in our employ a great many years aiid knows his duties, and I can vouch for him.”
Now, that goes very faintly in the direction of admitting some authority from the market company for him to make the arrest, but certainly it is so faint as to amount to nothing in the way of overthrowing and countervailing the very •explicit testimony offered on the part of the defendant, that his authority to make arrests never was derived from the Market House Company, but was derived from his commission as a member of the Metropolitan Police. I suppose there can be no doubt at all if he had been an officer regularly employed by the District authorities, and had simply been detailed for service at the market, the company would not have been in the slightest degree responsible for any abuse of his authority as such officer. The only thing that is apt to leave some confusion in our minds is this dual employment by him, in the character of agent of the company and agent of the public. There may be some difficulty in discriminating between the two and between the acts he does in one character and in the other, but still there is no doubt he can perform some duties in one character that he cannot in the other. Under his authority as a mere agent to keep order and collect rents in the market, he certainly has no authority to make arrests for crime. He could only do that by virtue of his authority of a police •officer, and acts he does of that description ought to be attributed to that character alone in which he could do them.
We have had cited to us in argument a number of cases tending to show rather strongly that if he had been simply agent of the company to collect rents and preserve order, and in that character, without any special connivance or direction from the officers of the company, had made this *394 arrest unlawfully, the company would not have been responsible. It would be an abuse of his authority as agent which they should not be held to have licensed. But no case exactly like the present one has been cited in which there has been dual employment, and none in which the police officer making the arrest derived his compensation or salary from the party sought to be charged, but we have found a case strongly in point in the Lawyers’ Reports Annotated, Vol. 8, 346 ; The Tolchester Beach Improvement Company vs. Steinmeier, decided by the Court of Appeals of Maryland. The case was very much like the present one and is very pertinent.
The appellant was a corporation known as the “ Tolchester Beach Improvement Company of Kent County,” and carried on an excursion business, by steamboats, bringing passengers from Baltimore and elsewhere to Tolchester Beach, in Kent County, where the company had a wharf, hotel, baths, &c. The plaintiff carried on a business on the shore in hiring small boats and fishing tackle, and got his customers mainly from persons who were appellant’s excursionists. Upon application to the governor of the State, the appellant had secured the appointment of Thomas J. Fletcher as a policeman for the protection of the property of the corporation, and for the preservation of peace and good order on the premises, the appellant to pay his salary.
The officer was appointed on the nomination of the appellant and was duly commissioned as a State officer. Oliver H. Paxton was appellant’s superintendent at the beach and he was, on the occasion of the disturbance, engaged in booming and securing certain drift logs which had come down the bay and floated around the appellant’s wharf and the public landing. He was upon the public landing, and securing them there. The plaintiff and his partner came with their boat and found their access to the landing obstructed. Pie came ashore by stepping on the logs, obtained a rope to throw to his partner in the boat, in order to draw the boat *395 around the logs, and make it fast. His contention is that he stepped on a log upon which Paxton was standing, and, in throwing the line, the log turned in the water, and cast him and Paxton both into the water, whereupon Paxton order Fletcher' to arrest him. Fletcher arose to approach the plaintiff, but the latter drew'his pistol and prevented the arrest, boarded his boat, and went around to his own premises, which he held under lease from the owners. Fletcher without warrant, pursued him to his own premises, and, having arrested him, handcuffed him and took him to jail, where he remained until after trial for the alleged assault, when he was acquitted and discharged. The court held:
“ The appellant depends upon the contention that it is not' responsible for this arrest and imprisonment because Fletcher was not acting as their employee, and that, if he was acting because of an order from Paxton, he had no authority to order an arrest. The Circuit Court ruled that Fletcher and Paxton were both officers of the company, and held the company answerable, and hence this appeal. Paxton was, without doubt, an officer of the company; but-because he was such officer it does not follow that he had .authority to order an arrest, and bind the company for the consequences of it. He was superintendent of the company at the beach. That office is not mentioned and described in the charter, and what the duties and authority of such superintendent were the appellee offered no proof, while the appellant offered evidence that it was of a restricted character, and did not embrace any authority to order an arrest. If the company was to be bound by Paxton’s act in directing the arrest it must be because the term ‘ superintendent/ of itself, and of necessity, imported such authority; for, to make the company answerable for his acts, the acts must appear to have been done within the limit and scope of his authority. It would be a most unwarrantable inference from the simple fact he bore that name that the alleged act *396 was authorized by the company. It was the criminal law of the State which was put in operation; and before the corporation can be held answerable for such act, this court said, in Carter vs. Machine Co., 51 Md., 298, ‘it should be made to appear that the agent was expressly authorized to act as he did by the corporation. The doing of such an act could not, in the nature of things, be in the exercise of the ordinary duties of the agent or servant intrusted with the custody of the company’s money or goods, and, before the corporation can be made liable for such an act, it must be shown either that there was express precedent authority for doing the act or that the act has been ratified and adopted by the corporation.’ There was certainly no express precedent authority to Paxton to set in motion the criminal law of the State, and we shall see hereafter that there was no ratification and adoption of it by the appellant.
“ The question now arises, was the Circuit Court right in holding the appellant answerable for the act of Fletcher? Was Fletcher such an officer of the company, and clothed with such powers of arrest, as made the company liable for his arrest, maltreatment and imprisonment of Steinmeier? For the purposes of this decision, and in support of our view of it, it is not necessary for us to be told that Fletcher was in no sense an officer of the company, and that, if ■called on to enforce regulations and by-laws of the company, and he did so purely because of his relation to the company, the company would not be answerable for what was wrongfully done in pursuance of that authority, but within the ■scope of his employment. But primarily Fletcher was a State officer, appointed by the Governor wider the law, and commissioned accordingly. It is true he was appointed upon the nomination or designation of the appellant, and by the law ivas to receive his compensation from the appellant.
“ He took the oath taken by all other police officers. He was responsible to the State for the proper discharge of his duty, and not to the company. He was not amenable to *397 the company, but to the State, and could be indicted for malfeasance as any other State officers. His duty was the same as any other policeman or constable. His authority was co-extensive with the limits of Eent County and the city of Baltimore, and for the protection of the property of said company or corporation, and the preservation ‘ of peace and good order on its premises.’ The law authorized the corporation to command his presence on their boats and premises on the condition of paying his whole compensation, and that no part of his compensation was to be chargeable against the State or county. Sections 290-292. It was for the privilege of commanding, at all times when needed, an officer with constabular powers, for the protection of their property and preserving the peace on their boats and premises, where in their peculiar business a need for such person, clothed with such authority, so often arose, that the law-required such corporations to pay his salary. In Sinclair vs. Mayor, 59 Md., 592, this court decided that the city of Baltimore was not responsible for wanton acts of its policemen in their discharge of duty, notwithstanding their compensation was paid by the city. It would seem, therefore, that this company was not bound for Fletcher’s acts simply because appointed by the Governor at its designation, nomination or request, and because it paid his salary. . ITe was■ undoubtedly a State officer, and whenever he attempted to enforce-the criminal laivs of the State, he did it in virtue of his oath as a State officer, and in the exercise of his common law powers as-such officer; and the company had no quasi judicial power to-order him to arrest any one, and certainly none to restrain him in the exercise of his office when his sworn duty 'required him to do-anything of the l&ind. The company needed such officer at command, because neither it nor its officers had the power with which the law clothed him.”'
The circumstances of this case show a very similar state of things. The Commissioners had no means at their command to detail and pay an officer for special duty at the- *398 market, and it was reasonable enough that the market company, if they desired such services, should j>ay the salary of the party employed. They already had persons in their employ, and it was suggested to them by the Commissioners that one of them conld be commissioned, and I presume his compensation as agent in the discharge of his ordinary duties was all the compensation he received. Now, it is true, that in such relation to the defendant, the officer perhaps had more inclination to show superserviceable zeal in behalf of the interests of the company. Nevertheless, his appointment under these circumstances did not change, in the slightest degree, his duties and his responsibility as an officer of the Metropolitan Police force, and we consider this arrest to have been made in virtue of that authority, and not as the agent of this company, and they ought not to be held responsible. .
At the trial below the verdict was rendered for the plaintiff for $160. On the evidence disclosed in the record we think the verdict ought to have been for the defendant, and the judgment is therefore reversed and a new trial granted.