138 So.2d 618 (1962)
Mrs. Alice WILSON, wife of Willie Wilson, Willie Wilson, and Willie Wilson, Jr.
v.
Frank Paul DIMITRI, Joseph Dimitri, Mrs. Camella Dimitri, Estate of Sam Dimitri, American Employers' Insurance Company of the Employers' Group.
No. 350.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1962.
*619 Revius O. Ortique, Jr., New Orleans, for plaintiff and appellant.
Racivitch, Johnson, Wegmann & Mouledoux, William J. Wegmann and Guy Johnson, New Orleans, for Joseph, Frank Paul and Mrs. Camella Dimitri, defendants and appellees.
Faris, Leake & Emmett, Robert E. Leake, Jr., New Orleans, for Joseph Dimitri, Mrs. Camella Dimitri, Estate of Sam Dimitri, and American Employers' Ins. Co. of Employers' Group, defendants and appellees.
Before REGAN, JOHNSON and SAMUEL, JJ.
REGAN, Judge.
Plaintiff, Willie Wilson, Jr., and his parents, Alice and Willie Wilson, instituted this suit against the defendants, Frank, Joseph
and Camella Dimitri, and the Estate of Sam Dimitri, as owners and operators of Dimitri's Bar and Grocery, and their insurer, American Employers' Insurance Company, endeavoring to recover the sum of $163,100, representing damages for pain and suffering, mental anguish, past and future medical expenses and permanent loss of earning capacity which plaintiff incurred when he was shot[1] in the back by Frank Dimitri, outside of defendants' place of business, during the course of a barroom altercation.
Defendants pleaded the exception of no cause of action, which was properly maintained against the elder Wilsons, since their son had attained majority when his injuries occurred. The defendants then answered and, in substance, asserted that Frank was justified in shooting the plaintiff in order to preserve the life of his brother, Joseph. In the alternative, they insisted that plaintiff was guilty of contributory negligence in that he provoked the altercation which resulted in his injury.
The Dimitri defendants also instituted a third party action against their insurer, who had issued an Owners', Landlords' and Tenants' Liability Policy, and asserted therein that should third party plaintiffs be cast in judgment, then the third party defendant was liable for the amount of that award. The insurer denied coverage therefor; however, the litigants interested therein stipulated that the third party action should not be tried by the lower court in conjunction with the main demand; therefore, no useful purpose would be served in discussing herein the alternative defenses of the third party defendant.
From a judgment in favor of the defendants dismissing plaintiff's suit and in favor *620 of the third party defendant dismissing third party plaintiff's claim, the plaintiff has prosecuted this appeal.
We feel compelled to remark at the inception of this opinion that the very nature of the strong and spontaneous emotions involved herein has provoked, more than usual, conflicting recitations of fact; however, we believe that the evidence adduced in the course of the trial hereof clearly preponderates to the effect that the following chain of events ultimately resulted in the injuries which induced this suit.[2]
On November 8, 1958, at approximately 9:30 p. m., plaintiff, a husky, 21-year-old Negro, 6'3" tall and weighing 195 pounds, met four companions in a bar located in Cleveland and Villere Streets in the City of New Orleans. Plaintiff had consumed several bottles of beer before entering this bar, and while there, he and his other four companions consumed between them, from three to five fifths of wine. They then decided to visit defendants' grocery and bar, located in 1936 Poydras Street, in order to purchase more wine and some food to prepare sandwiches. When they entered defendants' establishment shortly after midnight, Anthony Cordova, one of plaintiff's companions, approached the bar and informed Joseph Dimitri that he wished to purchase either a stick or a package of gum. His four companions, including the plaintiff, proceeded to play the juke box.
The gum was kept in the grocery section of this establishment, which was separated from the bar by a partition, so it was necessary for Joseph Dimitri to leave the bar momentarily in order to obtain the gum; when he did so, Cordova stepped behind the bar, stole a bottle of wine and concealed it under his jacket.
Joseph Dimitri moments later re-entered the bar and noticed a bulge under Cordova's coat; he pulled it open and retrieved the bottle stolen by Cordova. He then accused him of theft and ordered him to leave the premises. In so doing he had raised his voice, which attracted the attention of his brother, Frank, who was sitting in that portion of the establishment reserved as living quarters for the Dimitri family. Frank emerged from the kitchen thereof brandshing a broom and either attempted to or actually did strike Cordova therewith. Cordova then ran from the bar and as he neared the door, he picked up an empty bottle from a nearby table and hurled it at the Dimitri brothers, who were standing very close to each other behind the bar.
Joseph then pursued Cordova with the intention of holding him for the police. Frank returned to the kitchen where he obtained a pistol. In the meantime, Cordova's four companions remained in the vicinity of the juke box and they had not, up to this psychological moment, involved themselves in the fracas. However when Joseph Dimitri[3] left the bar in pursuit of Cordova, plaintiff[4] ran and caught him just outside of the entrance thereof where they engaged in a violent struggle.
This was the frightening scene which confronted Frank Dimitri when he returned to the entrance of the bar with a pistol and shot the plaintiff.
In explanation thereof, Dimitri asserted that when he reached the entrance to the bar, he saw plaintiff with one of his hands around his brother's throat, and with the other hands, plaintiff was "jugging" at him with the neck of a broken bottle. He also related that his brother's body was covered with blood. Frank Dimitri, in response to *621 interrogatories explained that he feared no harm would come to him or his family from the three Negros, who remained inside of the bar, because he knew them. His purpose for procuring the gun was to protect his wife and family who were seated in the kitchen from both Cordova and Wilson, whom he did fear.
Two Negro witnesses[5] actually saw the fight. Alvin Biggs, who was seated on a doorstep about 30 feet from the scene, testified that he saw no weapon in plaintiff's hand, and said that had there been one, he would have seen plaintiff raise and lower his arm had he been trying to stab Joe Dimitri with a piece of broken glass.
James Brown, who was assisting an intoxicated man into an automobile parked a few feet from the scuffle, also said that he failed to notice the neck of a bottle in plaintiff's hand. He further asserted that his attention was attracted by the fight but then he turned his back thereon since he was under the impression that the Negro and white were merely "skylarking". This last statement taxes our credulity, especially since he said that he was approximately ten feet removed from the violent struggle.
When the police investigated the shooting, a broken bottle neck was found near plaintiff's body. However, Frank Dimitri, in relating his version of the shooting to the police, never mentioned that plaintiff had a broken piece of glass in his hand as he testified on the trial hereof. He merely said he saw blood on his brother's arm and neck. Following the fight Joseph Dimitri was treated by his physician for a contusion on the left side of his face and a laceration of the elbow.
Predicated on evidence related hereinabove, the trial judge concluded that the following conditions existed when Frank Dimitri shot plaintiff, which exculpated defendants' from any liability in connection therewith: (1) Frank Dimitri had reason to believe that his brother's life was in danger, and (2) the force he used to deter his brother's assailant was not excessive.
Counsel for the defendants insists that it was not incumbent upon the defendants to justify Frank Dimitri's ultimate course of action because plaintiff instigated the fight and, under the aggressor doctrine, one who provokes trouble cannot recover when he is injured as a result thereof, even though the act causing the injury was not completely justified in law.
We find only some merit in this dogma. It is true that the defendants have correctly stated the general rule;[6] however, it is not inflexible and exceptions thereto have been recognized by our jurisprudence on innumerable occasions. As the trial judge pointed out in a well-considered opinion, our courts have applied the rule of reason to each case with the result that an aggressor is permitted to recover if he is injured through the use of excessive force applied to repel his attack.[7]
Therefore, the only question which is posed for our consideration is whether the force which was used by Frank Dimitri to deter his brother's assailant was excessive. The yardstick of the reasonable, prudent man is, generally speaking, the judicial tool used to measure whether the force used to repel the attack was excessive.
*622 While we realize that brawls and altercations are not unknown to proprietors of establishments such as defendants operated,[8] the incidents above enumerated, considered as a whole panorama, still were of such a vital nature so as to cause Frank Dimitri to become extremely apprehensive.[9] This is especially true since his family lived on the premises and his mother, wife and children were in an adjoining room when the altercation occurred.
In this agitated state of mind, Frank Dimitri rushed to the entrance with his pistol drawn and was unexpectedly confronted with the vision of a large, husky Negro pinning his brother to the sidewalk with a strong grip on his throat. Simultaneously, he noticed blood on his brother's arm and neck, all of which further aided in creating the reasonable presumption that Joseph Dimitri's life was in danger. It was sufficient that he reasonably believed the danger to his brother's life to be imminent. Given this belief based on reasonable grounds, immunity from liability is not judicially withdrawn because some other reasonable man may have perceived the idea of disabling the assailant instead of shooting him. Detached reflection, or a pause for consideration, cannot be demanded under such trying circumstances which by their very nature require a split second decision. To reason otherwise would establish a premise totally unrelated to normal human conduct under the stress of a spontaneous overflow of powerful emotions.
In reaching the above conclusion, we have discounted Dimitri's testimony to the effect that he saw a jagged bottle neck in plaintiff's hand and we also think that he probably exaggerated when he stated his brother was literally covered with blood since Joseph Dimitri, after the fracas, was treated by his physician for a cut on the elbow and a contusion of the left side of his face.
To reiterate, even disregarding the foregoing assertions of Frank Dimitri, we are compelled to rationalize that the circumstances which resulted in plaintiff's injury and the frightening scene which confronted Dimitri when he discharged the pistol were sufficient, first, to raise a high degree of apprehension in a reasonable man and, second, in this state, to cause him to believe that his brother's life was in jeopardy. Therefore acting in conformity with this reasonable presumption, Frank Dimitri did not use excessive force in order to successfully repel plaintiff's violent attack upon his brother.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
NOTES
[1] Plaintiff is paralyzed for life as a result of the wound.
[2] Plaintiff's version of the incident conflicts with those of every other witness. According to plaintiff, he was shot in the back as he walked away from the bar in order to avoid trouble and he fully denies that he was involved in a fight with Joseph Dimitri, one of the defendants, at the same time he was injured.
[3] Joseph Dimitri was 5'9" tall and weighed 140 pounds.
[4] Plaintiff, Willie Wilson, Jr., was 6'3" tall and weighed 195 pounds.
[5] The other three Negroes who were companions of Cordova and the plaintiff remained in the bar and, therefore, did not witness the fight.
[6] Miller v. Meche, 111 La. 143, 35 So. 491; Hingle v. Myers, 135 La. 383, 65 So. 549; Mecom v. Marshall, La.App., 64 So.2d 515.
[7] Oakes v. H. Weil Baking Company, 174 La. 770, 141 So. 456; Randall v. Ridgley, La.App., 185 So. 632; Bacas v. Laswell, La.App., 22 So.2d 591; Bethley v. Cochrane, La.App., 77 So.2d 228.
[8] In Randall v. Ridgley, 185 So. 632, an altercation occurred in a bar similar to the one operated by defendants herein, and the court had this to say about what the bar owner should anticipate:

"We realize that the position of a proprietor of an establishment such as Ridgley conducted, in dealing with obstreperous patrons surcharged with liquor, is a difficult one, and not free of danger to life or limb, when the passions of angry and intoxicated men are inflamed by a sense of injury. But such unhappy incidents are inherent in that character of business and must be anticipated by the proprietors of such establishments. * * *"
[9] Whether the person who is accused of injuring a plaintiff by the use of excessive force has had reason to be apprehensive of a potential danger to himself or his family from circumstances that have gone before is an extremely significant factor to be considered when attempting to evaluate his action which caused the injury in the light of reasonableness or unreasonableness. See Patterson v. Kuntz, La. App., 28 So.2d 278, and Pearson v. Taylor, La.App., 116 So.2d 833.