166 So.2d 351 (1964)
Joseph TEZENO, Plaintiff and Appellant,
v.
MARYLAND CASUALTY COMPANY, Vincent Thibeaux and Albert Isadore, Defendants and Appellees.
No. 1173.
Court of Appeal of Louisiana, Third Circuit.
July 10, 1964.
*352 Domengeaux & Wright, by Mark Bienvenu, Lafayette, for plaintiff-appellant.
Mouton, Champagne & Colomb, by Welton P. Mouton, Lafayette, for defendant-appellees.
Before FRUGÉ, TATE and HOOD, JJ.
HOOD, Judge.
Plaintiff, Joseph Tezeno, instituted this suit against Albert Isadore, Vincent Thibeaux, and Maryland Casualty Company to recover damages for the death of his son, Ambrose Tezeno, who was shot and killed by Albert Isadore. No answer was filed by Thibeaux and no judgment has been rendered against him. Answers were filed by the remaining defendants, and after trial judgment was rendered (1) in favor of plaintiff and against defendant Isadore for the sum of $5,000.00, and (2) in favor of Maryland Casualty Company dismissing the suit as to that defendant. Plaintiff has appealed, contending that the trial judge erred in dismissing the suit as to Maryland Casualty Company and that the amount of the award should be increased. Defendant Isadore has answered the appeal praying that the judgment condemning him to pay damages be reversed.
The evidence shows that the decedent, Ambrose Tezeno, and his brother went to the Gil Theater in Lafayette, Louisiana, during the afternoon of October 29, 1961. Both purchased tickets, and after entering the theater the decedent became boisterous. Defendant Isadore, who was then employed by the owner of the theater, approached the decedent and asked him to leave. An argument took place between Ambrose and Isadore, but the decedent's brother intervened and pushed the decedent out of the theater. After the parties were outside the theater, the decedent approached Isadore and demanded that the purchase price of his ticket be refunded to him. While decedent was approaching Isadore outside the theater, the latter drew a pistol from a holster which he wore on his person and fired four shots in the direction of the decedent, three of which entered his body killing him almost instantly. Both the decedent and Isadore are members of the Negro race.
At the time this incident occurred Isadore was employed by Vincent Thibeaux, owner of the Gil Theater, to keep order in and around that building. Isadore was wearing a policeman's uniform at the time, and he carried a loaded pistol in a holster at his side.
The first important issue presented is whether Isadore was justified in shooting the decedent under the circumstances presented here, and thus whether he is responsible in damages for Tezeno's death. Defendants contend that the decedent was the aggressor, that it was necessary for Isadore to shoot in self-defense, and that plaintiff for that reason is barred from recovery. Plaintiff contends that decedent was not the aggressor and that the shooting was unprovoked. Alternatively, he argues that even though his son may have been the aggressor defendant Isadore used excessive and unnecessary force in repelling the attack, and that for that reason he is responsible in damages for the death of the decedent.
The trial judge concluded that "Ambrose was making a disturbance and did advance upon Albert Isadore," but that the force *353 used by defendant Isadore "to repel the invasion was excessive." He found, therefore, that Isadore was responsible in damages for the death of plaintiff's son.
There is a conflict in the testimony of witnesses as to whether the decedent was actually the aggressor. Our review of the evidence satisfies us, however, that the trial court was correct in concluding that the decedent was the aggressor at the time the shots were fired. A few moments prior to that time he had made at least one attempt to strike Isadore with his fists, and at the time the first shot was fired he was advancing toward Isadore in a belligerent manner, using profane language. The evidence also establishes, however, that neither the decedent nor his brother had a weapon of any kind, and there was nothing in the actions of either which we feel could have caused Isadore to think that they were armed. The decedent was intoxicated, and the principal cause of his belligerency at the time of the shooting was that he wanted a refund of the price of his ticket. Prior to the shooting the decedent's brother had been endeavoring to subdue Ambrose, and we find nothing in the evidence which should have caused Isadore to fear an attack by the brother. The shooting occurred outside the building, in the open, and Isadore concedes that he was about 10 feet from the decedent when the first shot was fired. Under these facts it seems to us that Isadore could have resolved the difficulty without the use of a pistol, and we accordingly find no error in the conclusion reached by the trial judge that defendant Isadore used force which was excessive and unnecessary in repelling the attack by the decedent.
In Bethley v. Cochrane, La.App.Orl., 77 So.2d 228 (Cert. denied), the court quoted with approval the following excerpt from 4 Am.Jur., Assault and Battery, Section 51, page 153:
"`One who, in acting in self-defense, uses force in excess of that which he is privileged to use, is liable for so much of the force used as is excessive, and the other person has the normal privilege of defending himself against the use or attempted use of excessive force. In other words, to the extent that excessive violence and unnecessary force is used in repelling an assault, one becomes liable as trespasser and subject to an action for assault and battery. In determining whether the particular means used is or is not excessive, the amount of force exerted, the means or instrument by which it is applied, the manner or method of applying it, and the circumstances under which it is applied are factors to be considered. Ordinarily, a person is not justified in using a dangerous weapon in self-defense where the attacking party is not armed but commits the battery by means of his fists or in some other manner not essentially dangerous to life or limb. * * *" (77 So.2d 231, Emphasis added.)
In Edwards v. Great American Insurance Company, La.App. 2 Cir., 146 So.2d 260, the rule was stated as follows:
"We recognize the correctness of the rule that resort to the use of a dangerous weapon in order to repel a supposed attack upon a defendant's person or upon persons to whom he owes a duty to protect cannot be countenanced as justifiable save in exceptional cases where the actor's fear of the danger is not only genuine but is founded upon facts which would be likely to produce similar emotions in men of reasonable prudence. Patterson v. Muntz, La.App. Orleans, 1946, 28 So.2d 278." (146 So.2d 262.
The First Circuit Court of Appeal, in allowing a plaintiff to recover for personal injuries in Ford v. Williams, La.App. 1 Cir., 62 So.2d 838, said:
"* * * However, it is fundamental law that a person can only use reasonable force in repelling an invasion of his person, and it is clear that, even though we were to assume that petitioner *354 was the aggressor, an unreasonable amount of force was used by defendant and his family in repelling same." (62 So.2d 840).
And, in Wilson v. Dimitri, La.App. 4 Cir., 138 So.2d 618, the court said:
"* * * As the trial judge pointed out in a well-considered opinion, our courts have applied the rule of reason to each case with the result that an aggressor is permitted to recover if he is injured through the use of excessive force applied to repel his attack." (138 So.2d 621).
In the instant suit, since the evidence establishes that Isadore used excessive and unnecessary force in repelling the attack by the defendant, and that plaintiff's son was killed as the result of the use of such unnecessary force, we think the trial judge correctly held that Isadore is responsible in damages to plaintiff for the death of his son.
The next question presented is whether Maryland Casualty Company is also solidarily liable to plaintiff for these damages.
At the time the shooting occurred, there was in effect a public liability insurance policy issued by Maryland Casualty Company to the City of Lafayette, in which policy Maryland Casualty Company obligated itself to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injuries, including death, sustained by any person and caused by accident. Among the hazards covered by the policy are the operations of "Policemen." Plaintiff contends that Isadore was a "Policeman" of the City of Lafayette at the time the shooting occurred, and thus that the public liability insurer of the City is liable under the policy for the damages resulting from the death of the decedent. Defendant Maryland, on the other hand, contends that Isadore was not a "Policeman" of the City and was not employed by it in any capacity, that the City of Lafayette could not be held responsible for his actions and that the policy issued by Maryland, therefore, provides no coverages for the damages sustained by plaintiff.
As we have already pointed out, at the time this incident occurred Isadore was employed by Thibeaux, the owner of the Gil Theater, to keep order in the theater. His salary for services rendered at the theater was paid entirely by Thibeaux. He was not an employee of the City of Lafayette, and he received no remuneration of compensation of any kind from the City. He had never been a member of, or an officer in, the Police Department of the City.
Sometime prior to the date on which this incident occurred the Chief of Police of the City of Lafayette had issued to Isadore a wallet-size card which reads as follows:
 "CITY POLICE DEPARTMENTLafayette, Louisiana
 Name ALBERT ISIDORE
 Signature s/ Albert Isidore
 HONORARY COMMISSION
 s/ Easton P. Dupre
 Chief of Police"
Isadore testified that he was a "special officer" of the City of Lafayette, and Captain Howard J. Benoit, a Detective on the City Police Department, also considered him to be a special officer. Isadore states, however, that he had no authority to make an arrest, and that his instructions were to call the "City Police" in the event of a disturbance and the City Police would then come and would make any arrest which may *355 be necessary. No oath of office was administered to Isadore, and there is nothing to show that he was listed on the records of the Police Department as a "special officer" or in any other capacity. He purchased his own uniform and pistol, neither of these items being furnished by the City of Lafayette. He received no training of any kind from the City Police Department, and he received no instructions from that Department, other than being told to call the City Police in the event an arrest became necessary. We think the evidence shows that the Police Department exercised no supervision over his actions at the theater, although Isadore states that he thinks the police chief had control over his actions, that he checks with the police chief at times and that he "would follow his instructions."
We have been referred to no statute and no ordinance of the City of Lafayette which grants to the Chief of Police the authority to appoint a person to serve as a policeman or as a special officer for the City, and there is nothing in the record or arguments of counsel which shows what power or authority becomes vested in a person by the issuance of an Honorary Commission to him by the Chief of Police, such as the one which was issued to Isadore here. We assume that the governing authority of the City has never officially appointed or designated Isadore to serve as a policeman or as a "special officer," since the evidence fails to show that any such action was ever taken by the City.
The term "Policeman" has been defined as "a member of the police," and the word "police" has been described as "[a]n organized civil force for maintaining order, preventing and detecting crime, and enforcing the law; the body of men by which the municipal laws and regulations of a city, town, or district are enforced." Burke v. State, 76 Ga.App. 612, 47 S.E.2d 116.
In Black's Law Dictionary, Fourth Edition, "Police" is defined as "the function of that branch of the administrative machinery of government which is charged with the preservation of public order and tranquillity, the promotion of the public health, safety, and morals, and the prevention, detection, and punishment of crimes." And, a "Police Officer" is defined in that dictionary as "one of the staff of men employed in cities and towns to enforce the municipal police, i.e., the laws and ordinances for preserving the peace and good order of the community. Otherwise called `policeman.'"
In Green v. City of Bennettsville, 197 S.C. 313, 15 S.E.2d 334, the Supreme Court of South Carolina held that "the duties of a policeman are varied and one of the incidents of such duty is the arrest of individuals who violate the laws and ordinances of the municipality." In Parker v. Travelers' Ins. Co., 174 Ga. 525, 163 S.E. 159, 81 A.L.R. 472, the Supreme Court of Georgia held that "a policeman is * * * a public officer whose duties relate to the governmental functions of a municipality, and for whose torts while exercising such functions the municipality is not liable." It also has been held that a policeman is the legal equivalent of the "watchman" at common law who possesses the power of arrest now vested in peace officers. Frank v. Wabash Railroad Company, Mo., 295 S.W.2d 16; Porter v. State, 124 Ga. 297, 52 S.W. 283; Harris v. Sevier, La.App. 1 Cir., 138 So. 459.
The terms "private policeman" and "special policeman" are defined in Corpus Juris Secundum, as follows:

"Private policeman. One employed by a private corporation to police its own property, who is paid by the employing company, and who is clothed with power to make arrests, and subject to the control of the police department of the city government, is not a municipal officer.

"Special policeman is a term used to designate one who is not a member of a permanent and organized police force, but who merely engages to do temporary police duty in a particular place or on a special occasion. It is the usual rule that special policemen are *356 public officers when performing their public duties, even though compensated by private employers." (62 C.J.S. Municipal Corporations, § 568, page 1091).
We think the term "Policeman," as that term is generally used and understood, means a person who is a member of an organized civil force for maintaining peace and order, preventing and detecting crime, and enforcing the law. A policeman of a city is a person who has been authorized and empowered by the city to perform duties which relate to its governmental function of maintaining peace and order. In this case, the City of Lafayette could not be held to be responsible for the actions of Isadore, even though his acts may have been designed to maintain peace and order, unless the City had authorized or empowered him to perform the duties usually performed by policemen or peace officers for the City, including the power to make arrests. See LSA-R.S. 15:58 et seq.
The evidence shows that Isadore was not and has never been a member of the Police Department of the City of Lafayette. He had received no authority from the City of Lafayette to make arrests or to perform any of the duties commonly performed by policemen or peace officers. Insofar as the City of Lafayette was concerned, he had no more authority to make arrests or to perform the duties of a peace officer than did any other private citizen or any other employee of the theater. His instructions were to call the "City Police" in the event a disturbance occurred or an arrest was necessary. Under these circumstances we agree with the trial judge that Isadore was not a "Policeman" for the City of Lafayette, and for that reason neither the City nor its public liability insurer can be held to be responsible for his actions which resulted in the death of Ambrose Tezeno.
Plaintiff relies on the cases of Musmeci v. American Automobile Insurance Company, La.App. 4 Cir., 146 So.2d 496 (Cert. denied), and Estrada v. Indemnity Insurance Company of North America, 158 Cal.2d 129, 322 P.2d 294. In our opinion, however, neither of these cases is applicable here. In the Musmeci case the "special police officer" was employed by the Board of Levee Commissioners of the Orleans Levee District, and the only pertinent issue presented was whether the public liability insurer of the employer, the Levee Board, was liable for the actions of this employee. No issue was raised as to whether he was a member of the city police department or whether the city's insurer was liable for his actions. In the Estrada case the "police officer" was clearly employed by the city as a policeman, and the question most closely related to this case which was presented was whether his actions were covered by a policy insuring the "City of Kerman And Its Officials While Acting Within Their Capacity As Such." In the instant suit defendant Isadore was not an employee or a police officer of the City of Lafayette.
We agree with plaintiff that when a provision in an insurance policy is subject to more than one reasonable and equally logical interpretation, the interpretation which is most favorable to the insured should be adopted. See Floyd v. Pilot Life Insurance Company, La.App. 2 Cir., 135 So.2d 546; Keenan v. Wactor, La.App. 3 Cir., 130 So.2d 800; and Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111. In this instance, however, we do not think that the policy insuring the City of Lafayette against liability can reasonably or logically be interpreted in such a manner as to provide coverage for the actions of defendant Isadore as an employee of the Gil Theater. In our opinion, therefore, the trial judge correctly dismissed the suit as to Maryland Casualty Company.
Plaintiff contends that the award of $5,000.00 made in this case is inadequate and should be increased. The evidence shows that plaintiff is 56 years of age, he apparently is able-bodied and he is engaged in farming for his living. He is married and has eight children living with him. The *357 decedent, who was 26 years of age at the time of his death, also was living with plaintiff. Plaintiff and one of his sons testified that for a period of time prior to his death the decedent gave plaintiff $25.00 each pay day, which we assume from the testimony occurred twice a month. During the time these payments were being made, however, plaintiff obviously was providing food and lodging for the decedent, and there is no indication in the record as to whether the payments made by the decedent covered or exceeded the expenses incurred by plaintiff in providing the necessities of life for his son. Under the facts and circumstances presented here we cannot say that the award made by the trial judge in this case was inadequate.
For the reasons herein set out the judgment of the trial court is affirmed. All costs of this appeal are assessed to plaintiff-appellant.
Affirmed.