**Donzell W. MOOREHEAD, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 97–CV–881.**

District of Columbia Court of Appeals.

Argued Feb. 25, 1999.
Decided March 16, 2000.

claims raised by the petitioners in their notice of appeal.

Andrew P. McGuire, for appellant.

Sheila Kaplan, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, Charles L. Reischel, Deputy Corporation

Counsel, and Rena K. Schild, Assistant Corporation Counsel, were on the brief, for appellee.

Before TERRY, STEADMAN, and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant Moorehead seeks reversal of the trial court's pre-trial dismissal of his claims against the District of Columbia on several grounds. First, he contends that the issue of whether a special police officer licensed by the District is an agent of the District for purposes of *respondeat superior* is a question for the jury, and that the court therefore should not have dismissed his *respondeat superior* claim before trial. Second, he asserts that there was a genuine issue of material fact on the issue of whether the police officer who arrested him had probable cause, thereby precluding summary judgment on this claim. Third, he maintains that the court abused its discretion when it refused to grant his motion for an extension of time to designate an expert under Super. Ct. Civ. R. 26(b)(4). We affirm.

## I

On December 7, 1994, Special Police Officer ("SPO") Rodney Brown was working in a Rite–Aid Pharmacy in the District of Columbia when a customer informed him that another person, appellant Moorehead, was stealing bottles of Tylenol from the shelves. According to Mr. Brown, when Moorehead left the store, the anti-theft alarm sounded, indicating that he had taken merchandise from the store without paying for it. Brown pursued Moorehead out of the store but was unable to catch him. As Moorehead fled, however, he dropped his gym bag; Brown retrieved it and took it back inside the store.

Brown inspected the contents of the bag in an office at the rear of the store, but he did not find any bottles of Tylenol or other items that appeared to be store properly. However, by the time Mr. Brown returned to the floor, Moorehead had come back to the store and was asking for his gym bag. Brown approached Moorehead and demanded that he return the stolen items; Moorehead in turn demanded the return of his bag. In the shoving match that ensued, SPO Brown, using his baton, knocked Moorehead to the ground and handcuffed him.[1] As a result of the altercation between the two, Moorehead allegedly suffered injuries to his leg and head. Brown was uninjured, but the condition of his uniform indicated that he had been in a struggle.

Moments later, Officer James Koons and other members of the Metropolitan Police arrived at the store in response to a call about an assault with a dangerous weapon. SPO Brown explained to Officer Koons that a customer had seen Moorehead stealing merchandise and that the store's alarm had sounded when Moorehead went out the exit door. Brown also told Officer Koons that Moorehead had resisted when he tried to detain him. Koons thereupon placed Moorehead under arrest for assault, but apparently not for shoplifting (the record is not entirely clear on this point, but the complaint contains no allegation of a shoplifting arrest).[2]

Several months later, Moorehead filed this personal injury action against the District of Columbia, Officer Koons, and "several unknown Metropolitan Police officers." His claims against the District were twofold. First, he asserted that the District was liable for SPO Brown's "attack" on him, based on theories of *respondeat superior* and negligent hiring, training, and supervision. Second, he claimed that the District was liable for false im-

---

1. Several witnesses, including both Moorehead and Brown, gave varying accounts in their depositions of the extent of the pushing and the amount of force that Brown used to subdue Moorehead.

2. Officer Koons also mentioned in the course of his deposition that Moorehead was drunk and that Brown was not.

prisonment and for negligent hiring, training, and supervision of Officer Koons and the other officers involved in his arrest, and that the District and the officers were liable for conspiracy to violate his civil rights.[3]

The District filed a motion for judgment on the pleadings, asserting that a special police officer such as Brown "is neither an employee nor an agent of the District such that a plaintiff injured by a special police officer can allege negligent hiring, training and supervision of that officer, or common law torts based upon a *respondeat superior* theory." Despite Moorehead's insistence that Brown's relationship to the District was a question of fact that could not be decided summarily, the trial court granted the motion and dismissed the portion of the complaint against the District that was based on the actions of SPO Brown. The court concluded that D.C.Code § 4–114 (1994), which authorizes the Mayor to appoint special police officers, "is a licensing statute which does not create an agency relationship between the person licensed and the District of Columbia, nor does common law."

Some time later the District filed a motion for summary judgment on the remaining claims for false arrest and deprivation of civil rights, arguing essentially that Officer Koons had probable cause to arrest Moorehead. Moorehead again responded that the issue of probable cause was an issue of fact for the jury because Officer Koons had failed to investigate adequately the circumstances of the incident before arresting him. The court found Moorehead's argument unpersuasive, since he had made no showing that further investigation would have negated probable cause.

It ruled that "the undisputed facts establish that Officer Koons had probable cause to arrest the plaintiff for assault, or at the very least a reasonable, good faith belief that he was acting lawfully in doing so." It therefore granted the motion for summary judgment. On appeal Moorehead challenges both rulings, as well as the trial court's denial of his motion to extend the time for designating an expert witness under Rule 26(b)(4).

## II

With respect to SPO Brown's conduct, Moorehead's claims against the District are based on the doctrine of *respondeat superior*.[4] "In order to succeed under the *respondeat superior* theory of liability, appellant must show that a master-servant relationship existed between [Brown] and [the District], and that the incident at issue occurred while [Brown] was acting within the scope of his employment." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C.1985). The trial court held, and we agree, that there is no basis on the essentially undisputed facts of this case for imposing *respondeat superior* liability on the District.

We hold, first of all, that Moorehead's reliance on *Wade v. District of Columbia*, 310 A.2d 857 (D.C.1973) (en banc), is misplaced because this case involves a special police officer rather than a regular police officer. In *Wade* this court held "that the District of Columbia may be sued under the common law doctrine of *respondeat superior* for the intentional torts of its employees acting within the scope of their employment." *Id.* at 863.[5] The "employees" involved in *Wade* were District of Columbia police officers, who allegedly as-

---

**3.** Moorehead's complaint also named Rite–Aid and SPO Brown as defendants, but the claims against those defendants were later settled.

**4.** Moorehead also alleged that the District had negligently hired and supervised Brown in his duties as a special police officer. The rejection of that claim is not challenged on appeal.

**5.** *Wade* was the first case from this court that so held. Before the *Wade* decision, the District had successfully relied on the defense of governmental immunity to defeat tort claims based on the intentional torts of its employees under the doctrine of *respondeat superior*.

saulted and falsely arrested the plaintiff. Rejecting the District's defense of immunity, we reversed the trial court's dismissal of the complaint and remanded the case for trial. Moorehead places heavy reliance on *Wade* and urges us to follow it here. We cannot do so because the issue which lies at the heart of this case—whether the alleged tortfeasor was an agent of the District—was uncontested in *Wade*. There was no dispute that the police officers in *Wade* were employees of the District, acting within the scope of their employment. *See id.* at 859. Special police officers, however, unlike regular police officers, are not as a matter of law agents of the District of Columbia. While there may be cases in which the particular facts show that a special police officer is an agent of the District,[6] this is not such a case.

■ "Whether a master-servant (or principal-agent) relationship exists in a given situation 'depends on the particular facts of each case.'" *District of Columbia v. Hampton*, 666 A.2d 30, 38 (D.C.1995) (quoting *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C.1982)).[7] This court considers several factors when determining whether there is such a relationship:

(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer.

*Hampton*, 666 A.2d at 38 (quoting *Le-Grand v. Insurance Co. of North America*, 241 A.2d 734, 735 (D.C.1968)); *see also Beegle, supra* note 7, 679 A.2d at 485; *Giles*, 487 A.2d at 611–612; *Safeway Stores*, 448 A.2d at 860. Of the five, "'the determinative factor' is usually the fourth: 'the right to control an employee in the performance of a task and in its result, and not the actual exercise of control or supervision.'" *Hampton*, 666 A.2d at 38–39 (quoting *Safeway Stores*, 448 A.2d at 860).

In striving to demonstrate a principal-agent relationship between the District and SPO Brown. Moorehead relies on various similarities between the duties and powers of special police officers and those of regular police officers.[8] He reasons that since the District is liable for the intentional torts and negligence of police officers acting within the scope of their employment, *see Holder v. District of Columbia*, 700 A.2d 738, 741–742 (D.C.1997); *Wade*, 310 A.2d at 863, it must also be

---

6. For example, the Mayor is authorized by D.C.Code § 4–130 (1994) to appoint special police officers in emergency situations. It might be argued in a particular case that a special police officer so appointed was under the exclusive control of the Mayor (or his agent, the Chief of Police) and therefore would likely be an agent of the District. We take no position here, of course, on the merits of such an argument.

7. Contrary to Moorehead's assertion, the fact that the existence or non-existence of a master-servant relationship usually depends on the particular facts of a case does not mean the case cannot be decided on a pre-trial motion for judgment on the pleadings or for summary judgment. The standard for summary judgment and judgment on the pleadings is essentially the same: such a judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *E.g., Beegle v. Restaurant Management, Inc.*, 679 A.2d 480, 483 (D.C.1996) (summary judgment); *Bell v.*

*Jones*, 566 A.2d 1059, 1060–61 (D.C.1989) (judgment on the pleadings).

8. There are several similarities between regular police officers and special police officers. For example: (1) both are required to follow rules governing the Metropolitan Police Department; (2) both must answer to the Chief of Police; (3) both may carry pistols and use handcuffs (but a special police officer's right to carry a pistol is limited to the property which the SPO protects and travel to and from that property, *see Timus v. United States*, 406 A.2d 1269, 1272 (D.C.1979)); (4) both wear badges and uniforms; and (5) both may make arrests upon probable cause. In addition, an assault on a special police officer is criminally punishable as an assault on a police officer under D.C.Code § 22–505(a) (1998). *See Booker v. United States*, 283 A.2d 446 (D.C.1971). Similarly, a person who impersonates a special police officer is guilty of impersonating a police officer under D.C.Code § 22–1304 (1996). *See Williams v. United States*, 404 A.2d 189 (D.C.1979).

liable for the tortious conduct of special police officers, such as Brown, who share many of the same responsibilities and duties. But despite the similarities, there are also numerous differences distinguishing special police officers from regular police officers,[9] some of which are crucial to the master-servant analysis. *See Hampton,* 666 A.2d at 38–39.

■ First, although the District (through the Mayor) appoints special police officers, the corporation or individual for whom the appointee works must apply for the appointment. That employer "selects and engages" the appointee "for duty in connection with the property of, or under the charge of, such corporation or individual ...." D.C.Code § 4–114.[10] In this case, Rite–Aid applied for Brown's appointment as a special police officer to protect its stores, and his commission was specifically limited to Rite–Aid property. Second, special police officers are "paid wholly by the corporation or person on whose account their appointments are made ...." D.C.Code § 4–114. Thus Brown's salary was paid by Rite–Aid, not by the District. Third, although the District has the power to deny, suspend, or revoke a special police officer's appointment, only the corporation or individual has the power to terminate the SPO's employment at any time, presumptively with or without cause. Once a special police officer ceases to work for his or her employer, that SPO loses the appointment and must return the special police officer badge to the District.[11]

Fourth, and most importantly, nothing in the statute or regulations gives the District control over special police officers. The statute, D.C.Code § 4–114, explicitly states that a special police officer is "under the charge of" the corporation or individual on whose behalf the SPO is appointed. There is no indication, either in this case or in general, that the Chief of Police exercises any control whatever over the day-to-day activities of special police officers, *see Hampton,* 666 A.2d at 39, or that he otherwise has "the right to control [an SPO] in the performance of a task and in its result ...." *Id.* at 38–39.

■ Moorehead argues that the District's control over Brown's activities as a special police officer is evidenced by the numerous regulations specifically governing SPOs. For example, regulations prescribe the type of uniform an SPO may wear, including the size of the patches to be worn on the sleeves and the types of buttons to be affixed to the uniform shirts. *See* 6A DCMR § 1109 (1996). The regulations also articulate a special police officer's duties: "The duties of the special police officers ... shall consist largely of periodically checking doors, windows, etc., in the nature of a 'watchman.'" 6A DCMR § 1101.6. We assume, for the sake of argument, that the regulation of the manner in which SPOs carry out their duties is comprehensive.

Nevertheless, this court has held that broad regulation of an activity authorized by the District does not, by itself, demonstrate control over persons involved in that activity. In *Hampton* the plaintiff sued

---

9. *See, e.g., Franklin v. United States,* 271 A.2d 784, 785 (D.C.1970) ("special policemen are commissioned for the special purpose of protecting property on the premises of the employer and ... they do not have the general duties and broad authority of a policeman or law enforcement officer in the ordinary sense of those terms"), *aff'd,* 148 U.S.App. D.C. 39, 458 F.2d 861 (1972).

10. Section 4–114 also authorizes the Mayor to appoint a special police officer "in his own discretion," but only "for duty in connection

with the property of, or under the charge of, such corporation or individual ...." That provision is not applicable here, for it is undisputed that SPO Brown was appointed at the behest of Rite–Aid.

11. A special police officer is required to deliver his or her badge to the Chief of Police within twenty-four hours after the termination of employment with the corporation or individual at whose request that SPO was appointed. 6A DCMR § 1104.2 (1996).

the District under a theory of *respondeat superior* for the wrongful death of her two-year-old daughter, which occurred while the child was in a foster home under the care and control of a foster mother. The rules and regulations governing foster homes and care for foster children were numerous and comprehensive and "show[ed] that the District [had] the authority to dictate many aspects of a foster child's life in a foster home." 666 A.2d at 40. Nevertheless, we held that such extensive regulation

> does not establish that the foster parent is under the *actual* control of the District to a degree sufficient to make him or her the District's agent.... If the District did not have the right to control the daily activities of caring for the foster child, then even this plethora of regulations cannot be said to have created a principal-agent relationship between the District and [the foster mother].

*Id.* (emphasis in original). The regulations covering SPOs are far less exhaustive than those relating to foster homes. They certainly do not establish that the District had control over SPO Brown in the circumstances presented here.

■ Besides relying on the regulations, Moorehead contends that the Metropolitan Police Special Officers Manual, which the Chief of Police issues to all special police officers, demonstrates the District's control over SPOs. The Manual instructs SPOs on such matters as the proper method of applying choke holds and instances in which to apply them, the language to be used when giving *Miranda* warnings, the manner of frisking suspects, and the proper use of firearms and other weapons. It explains that a special police officer's failure to obey orders or directives issued by the Chief of Police is grounds for the immediate denial, suspension, or revocation of an appointment as a special police officer. The Manual, however, was never presented to the trial court in any manner (*e.g.*, as an exhibit accompanying Moorehead's response to the District's motion for judgment on the pleadings), and thus it never became part of the record; consequently, we may not consider it in support of Moorehead's argument. "Appellate review is limited to matters appearing in the record before us ...." *D.C. Transit System, Inc. v. Milton,* 250 A.2d 549, 550 (D.C.1969).[12] In any event, the Manual would not have any effect on this case because, as we have explained in the past, such documents have no legal force or effect. *Wanzer v. District of Columbia,* 580 A.2d 127, 133 (D.C.1990) ("Agency protocols and procedures, like agency manuals, do not have the force or effect of a statute or an administrative regulation"); *accord, e.g., Phillips v. District of Columbia,* 714 A.2d 768, 774 (D.C.1998); *Clark v. District of Columbia,* 708 A.2d 632, 636 (D.C.1997).

■ Next, Moorehead maintains that because Brown is not an agent of Rite–Aid, he must be an agent of the District. He cites numerous cases from the District of Columbia and elsewhere which hold that a private employer is not liable for the actions of a special police officer or security guard when the allegedly tortious act was done in the exercise of his duty as a public officer.[13] Moorehead's logic is

---

12. In an effort to get around this principle, Moorehead has proffered the Manual to us under D.C. Ct.App. Rule 28(k), which permits a party to advise the court of "pertinent and significant authorities" that come to the attention of that party after the briefs have been filed. We reject this proffer for two reasons. First, the Manual is not an "authority" within the contemplation of the rule. Second, supplementation of the record is governed by this court's Rule 10(e), not Rule 28(k). Any effort to "supplement" the record with the Manual would have to be rejected, since it was never before the trial court in the first place and thus cannot qualify for inclusion in the record on appeal.

13. *E.g., Bauldock v. Davco Food, Inc.,* 622 A.2d 28, 34 (D.C.1993) ("Davco cannot be held liable for an act which the officer was required by statute and regulation to perform as a Metropolitan Police officer even while off duty").

flawed. It does not automatically follow from the fact that a special police officer is not considered an agent of one person or entity (Rite–Aid) that he must be the agent of someone else (the District) who may have some authority over his actions. Moreover, the cases on which Moorehead relies involve a different issue: whether the allegedly tortious actions were within the special police officer's scope of employment as an SPO, rather than part of his duties as a public officer. That has nothing to do with the issue presented here, which is whether SPO Brown was a public officer in the first place, *i.e.*, whether a master-servant relationship existed between Brown and the District. That question is answered by such cases as *Hampton* and *Safeway Stores*.

 Finally, Moorehead contends that special police officers are state agents as a matter of law, citing *Woodward & Lothrop v. Hillary*, 598 A.2d 1142 (D.C.1991), and that therefore they must be regarded as agents for *respondeat superior* purposes. In *Hillary* this court concluded that a special police officer could be held liable under 42 U.S.C. § 1983 (1988) for civil rights violations. *Id.* at 1146.[14] We held that the SPO's liability under that statute depended on whether he was acting "under color of state law." Relying on previous cases which held that searches and seizures by special police officers were subject to the restrictions of the Fourth Amendment,[15] we concluded that the SPO exercised "a 'power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). However, the mere fact that a special police officer is acting

"under color of state law" when he arrests a suspect does not mean that he is acting under the *control* of a state or local government so as to make him an agent of that government. The two concepts must not be confused. One involves the exercise of power reserved for state actors (arrest for probable cause); the other involves holding one person or entity responsible for the actions of another because of the relationship between the two (vicarious liability). That relationship, demonstrated by control in a *respondeat superior* case, is the decisive factor in vicarious liability analysis.

 We conclude that a special police officer, rather than being an agent of the District, has essentially the same status as an architect, a beautician, an engineer, or a physician, each of whom is licensed by the District to perform a particular activity. *See United States v. Lima, supra* note 15, 424 A.2d at 118–119 (distinguishing unlicensed security guards from special police officers). The District licenses special police officers to protect private property. But "[t]he District of Columbia's mere licensing of security guards [as SPOs] . . . does not so implicate the District in the actions of those [SPOs] so as to make all their actions governmental." *United States v. McDougald*, 350 A.2d 375, 378 (D.C.1976) (citations omitted); *accord, Hillary*, 598 A.2d at 1146 n. 6 ("Governmental licensing or extensive regulation of private activity alone does not warrant ascribing acts of the regulated entity to the state" (citation omitted)). In this case, as the trial court held, Brown's status as an SPO is not determinative of a principal-agent or master-servant relationship. We hold that the trial court properly granted judgment

---

14. Moorehead's section 1983 claim against Brown was settled along with all the other claims against him, leaving only the claim against the District based on Brown's actions as an alleged agent of the District. Moorehead did not attempt to bring a section 1983 action against the District under a theory of *respondeat superior*, nor could he have suc-

cessfully done so *See Kidwell v. District of Columbia*, 670 A.2d 349, 351–352 (D.C.1996).

15. *See, e.g., Alston v. United States*, 518 A.2d 439, 441–443 (D.C.1986); *United States v. Lima*, 424 A.2d 113, 119–120 (D.C.1980) (en banc); *Lucas v. United States*, 411 A.2d 360, 362 (D.C.1980).

in favor of the District on Moorehead's *respondeat superior* claim.

### III

 Moorehead also challenges the trial court's grant of summary judgment against him on his claim that he was falsely arrested by Officer Koons. "In actions for false arrest and false imprisonment, the central issue is 'whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails.'" *Scott v. District of Columbia*, 493 A.2d 319, 321 (D.C.1985) (citation omitted); *accord, District of Columbia v. Murphy*, 631 A.2d 34, 36, *reaff'd on rehearing*, 635 A.2d 929 (D.C.1993). "To prevail, the arresting officer need not prove probable cause in the constitutional sense, but rather must prove that he had a reasonable good faith belief that the suspect committed the offense." *Safeway Stores*, 448 A.2d at 862; *accord, Murphy*, 631 A.2d at 36.[16] To determine whether the arresting officer had probable cause or a good faith belief, the court evaluates the evidence from the perspective of the officer, not the plaintiff. *See Murphy*, 631 A.2d at 36–37; *Safeway Stores*, 448 A.2d at 862. Although "the issue of probable cause is a mixed question of fact and law that the trial court should ordinarily leave to the jury," *Murphy*, 631 A.2d at 37, that is not required in every case; "where the facts

are undisputed or clearly established, a question of law arises for the court." *Safeway Stores*, 448 A.2d at 862.

 In this case, the undisputed facts established that Officer Koons entered the pharmacy to find Moorehead bloody and in handcuffs, smelling of alcohol, and SPO Brown uninjured but with his shirt untucked and his clothes rumpled. Brown told Officer Koons that Moorehead had stolen merchandise from the store. He explained that when he attempted to detain Moorehead, Moorehead assaulted him while resisting. Brown further reported that when Moorehead resisted, he used his baton to subdue him. Relying on these facts, Officer Koons arrested Moorehead for assault. Although Officer Koons testified at his deposition that he thought Brown's use of force might have been excessive, that suspicion did not nullify his good faith belief that Moorehead had assaulted Brown.[17] Whether Koons bad probable cause to arrest Brown is not relevant to whether he had probable cause to arrest Moorehead.

On the record before us, we hold that Officer Koons had probable cause, or at the very least a reasonable good faith belief, that Moorehead had committed an assault. *See, e.g., United States v. Simpson*, 330 A.2d 756, 758 (D.C.1975) (officer had probable cause to arrest defendant when assault victim reported the assault and identified defendant as his as-

---

16. We made clear in *Murphy* that although a police officer "may justify an arrest by showing that he or she had probable cause, in the constitutional sense, to make the arrest," the officer is not required to do so in every case, so long as the officer at the time had a reasonable good faith belief that his or her conduct was lawful. *See* 631 A.2d at 36 (citing *Scott* and other cases).

17. Moorehead filed a motion under Super. Ct. Civ. R. 60(b) for reconsideration of the order granting summary judgment. Along with that motion, Moorehead submitted an affidavit from Darryl Washington, the store manager which Moorehead interprets as showing that Koons believed Brown had used excessive force. Accepting that interpretation, we hold

nevertheless that such a belief on Koons' part would not negate his probable cause to arrest Moorehead so that Washington's affidavit could not have raised a genuine issue of material fact. In any event, the court correctly concluded that Washington's statement could not be considered under Rule 60(b), since Moorehead had "fail[ed] to show that he exercised due diligence in attempting to discover this evidence in time to respond to defendants' motion for summary judgment." Moorehead had Washington's last known address for months before the court decided the summary judgment motion, but only after the court granted summary judgment did Moorehead attempt to contact Washington at that address.

sailant). We reject Moorehead's argument that there was a genuine issue of material fact with respect to probable cause because Officer Koons failed to conduct a more thorough investigation before making the arrest. Moorehead fails to cite a single case, and we have not found one, which requires an officer to conduct an investigation in order to *dispel* a good faith belief that a suspect has committed a crime. Moreover, Officer Koons' alleged failure to interview Moorehead at the store is of no consequence because Moorehead was present when Koons was talking with Brown and had plenty of opportunity at that time to present his side of the story. Finally, as the trial court concluded, Moorehead failed to demonstrate how further investigation would have negated Koons' probable cause or good faith belief for the arrest.

Moorehead's reliance on *District of Columbia v. Murphy* is misplaced. In *Murphy* police officers arrested the plaintiff for unlawful entry on the basis of statements made by the plaintiff's girl friend. However, one of the basic elements of unlawful entry, that the girl friend had asked the defendant to leave and he refused, was not part of the evidence presented at trial. Although there was evidence which suggested that such a request might have been made and that the plaintiff had refused to leave, there was also evidence to the contrary, thus precluding a directed verdict or judgment n.o.v. *Murphy*, 631 A.2d at 38–39. In the case at bar, the court concluded that Officer Koons had probable cause to believe that Moorehead had committed an assault on Brown, based on the undisputed evidence offered by the District. Even now, Moorehead does not contest that evidence but argues that more investigation should have been undertaken. That is not enough to defeat summary judgment.

18. This court reviews decisions on matters of discovery for abuse of discretion. *See, e.g.,*

## IV

Moorehead's final argument is that the trial court erred when it denied his motion for an extension of time to designate an expert under Super. Ct. Civ. R. 26(b)(4). He claims that because the District agreed to the extension, there was no prejudice to the District or to the court and that the court therefore should have granted the motion as a matter of course. This argument is defeated by the express language of another rule which governs scheduling orders: "The scheduling order may not be modified except by leave of court upon a showing of good cause; *stipulations between counsel shall not be effective to change any deadlines in the order without court approval* [with one limited exception not pertinent here]." Super. Ct. Civ. R. 16(b) (emphasis added). While the rule does authorize one agreed-upon extension of fourteen days. Moorehead sought a thirty-day extension and filed his motion on the day that the Rule 26(b)(4) designation was due. We conclude on these facts that the trial court did not abuse its discretion when it denied Moorehead's motion,[18] especially when he failed to make a showing of good cause for the extension. Furthermore, because Moorehead concedes that his claim against the District for negligent hiring and supervision of Officer Koons could not survive summary judgment without expert testimony, the court properly dismissed it.

## V

We hold that a special police officer who is hired by a private employer and who is nominated for appointment as a special police officer by that employer is not an agent of the District, absent some further showing that the District exercised actual authority and control over the special police officer in his or her daily activities. Because Moorehead failed to make such a showing here, or even to allege facts which might support a finding of such

*Rosenthal v. National Produce Co.,* 573 A.2d 365, 374 (D.C.1990).

authority and control, the trial court correctly dismissed those of Moorehead's claims against the District which were based on SPO Brown's conduct under a theory of *respondeat superior.* We also hold that Moorehead failed to demonstrate any genuine issue of material fact on the issue of Officer Koons' probable cause to arrest him. While there were some facts in dispute, they were not material facts; thus summary judgment was justified. Finally, Moorehead has failed to persuade us that the trial court's denial of his motion to extend a discovery deadline was an abuse of discretion. Accordingly, the judgment of the trial court is in all respects

*Affirmed.*

SCHWELB, Associate Judge, dissenting:

December 7, 1994 was Donzell W. Moorehead's Pearl Harbor. On that date, according to Mr. Moorehead's allegations, which we must credit in the present posture of the case, see *infra* pp. 151, 155, Moorehead was brutally assaulted without the slightest justification by District of Columbia Special Police Officer (SPO) Rodney Brown, who had accused Moorehead of stealing two bottles of Tylenol from a Rite Aid drug store. Moorehead alleges that Brown, using a lead-filled baton, fractured Moorehead's cheek bone, broke one of Moorehead's legs, and beat Moorehead into a bloody and semi-conscious pulp. Moorehead further claims that Officer James Koons of the Metropolitan Police Department (MPD), who was called to the scene, arrested Moorehead (the victim of the assault) without probable cause, while leaving Brown (the perpetrator) at liberty, and that Koons counseled Brown to fabricate evidence against Moorehead. Moorehead contends that both the SPO and the MPD officer were acting as agents of the District of Columbia, and that the District is therefore vicariously liable for their allegedly unlawful actions.

Notwithstanding the seriousness of his allegations of official misconduct and abuse of authority, Moorehead has not been permitted to present his evidence to a jury. On March 29, 1996, the trial judge granted the District's motion for judgment on the pleadings with respect to the claim based on the beating of Moorehead by SPO Brown. On August 2, 1996, the judge granted summary judgment in favor of the District as to Moorehead's claim that he was 'arrested by Officer Koons without probable cause. The trial judge thus held that Moorehead has no recourse against the District, even if his allegations are entirely true. My colleagues in the majority affirm that judgment.

In my opinion, Moorehead's case should have been permitted to go to trial. In ruling on the District's motion for judgment on the pleadings, the trial court and this court were both required to credit the well-pleaded allegations of the complaint. In addressing a motion for summary judgment, both courts were obliged to view the record in the light most favorable to the plaintiff, and to draw every reasonable inference in Mr. Moorehead's favor. As I see the case, the majority has failed to adhere to these standards and has not adequately considered certain allegations and evidence which are helpful to Moorehead's case and which are important to the proper disposition of the appeal. In addition, I believe that the majority takes too restrictive a view of the circumstances under which vicarious liability may be imposed on the District and too permissive an approach as to what constitutes good faith belief and probable cause.

The consequence of the majority's disposition is that a citizen's potentially meritorious claim of serious injury caused by official lawlessness has been prematurely consigned to judicial oblivion. In my opinion, a jury, properly instructed as to the applicable legal principles, ought to be permitted to pass on Mr. Moorehead's allegations. Because my colleagues disagree, it is my duty to dissent.

## I.

The record, viewed in the light most favorable to the plaintiff, reflects a profoundly disturbing series of events and a serious violation of the most fundamental liberty interests.

On December 7, 1994, William D. Moorehead was approximately four months short of his forty-eighth birthday. He was 5'3" in height and weighed 168 pounds. On that afternoon, according to his own account, Mr. Moorehead entered a Rite Aid Pharmacy to make a purchase. He placed his tote-bag near the front door. A few minutes later, before he bought anything, Moorehead saw a bus that he wanted to catch, and he left the premises. Shortly thereafter, realizing that he had left the tote-bag in the store, Moorehead re-entered the establishment. The bag, however, was not where he had placed it. Moorehead asked to see the manager, but suddenly, according to his account,

> I was struck on the head from behind without warning. I turned around and was hit a second time. I raised my arms to cover my head as I fell to the ground and lost consciousness.

After Moorehead fell to the floor, his assailant dragged him to the back of the store and continued to beat him about the head, body, and legs. Moorehead was also handcuffed and searched, but no contraband was recovered from him. He suffered a fractured cheekbone, a broken leg, and other injuries. He claims that he subsequently incurred $30,000 in medical expenses.

The individual who inflicted the beating was SPO Rodney Brown, who was on duty at the pharmacy. Brown was forty-two years old. 5'10" in height, and weighed 230 pounds. He was thus five years younger than Moorehead, seven inches taller, and more than sixty pounds heavier.

Brown testified on deposition that he is "aggressive in my approach to stopping shoplifters," and he asserted that Rite Aid supervisors knew this to be so. Moorehead claimed in his answers to interrogatories that during the beating, which was administered with a baton.

> Rodney Brown stated to me: "I'm going to teach you a lesson, you homeless motherfucker . . . ."
>
> When I asked that someone call the police, Rodney Brown stated to me: "I am the police."

SPO Brown's beating of Mr. Moorehead was witnessed in part by Darryl D. Washington, who was then the manager of the pharmacy.[1] According to Mr. Washington,

> the customers began to scream that the security guard was going to kill him. I thought Rodney had lost control, so I asked someone to call the police.

Someone evidently did call, for Officer James Koons of the MPD soon received a report of an assault with a dangerous weapon—blackjack. Koons and several other officers promptly reported to the Rite Aid Pharmacy.

In a pretrial deposition, Officer Koons described what he observed upon his arrival on the scene:

> . . . . Walked into Rite Aid. In the back of the store, there was a man cuffed and an SPO there standing next to him.
>
> I asked what happened. Roughly, the story was that he tried to steal some stuff out of there. Left, Left his bag there. The guy didn't—the SPO did not catch him on the first exit.
>
> He came back for his bag later on. That's when the SPO tried to stop him and detain him. He resisted and assaulted or fought back against the SPO. The SPO then arrested him.

---

1. Mr. Washington's account is contained in an affidavit filed by Mr. Moorehead's attorney in support of a motion to vacate the trial court's order granting summary judgment. My colleagues apparently view the affidavit as not being properly before the court, and they do not address its contents. I disagree with the majority's approach to this question. See Part IV. *infra.*

That's the story I got from the SPO. But like I said, when I got there, he was cuffed and on the ground.

Although SPO Brown told Officer Koons that he (Brown) "had to use his baton to effect the arrest," Koons was evidently skeptical. Brown alleged that Moorehead "started fighting me," but, according to Koons, it was "clear who got the worst end of the stick, so to speak." It seemed to Officer Koons, "in my experience, that [Brown] had gone a little overboard, [a]nd I wasn't certain whether it was justifiable or not." In fact, there was "a question whether or not the SPO was going to get locked up," but Officer Koons evidently decided not to arrest Brown. Instead, Koons placed Moorehead under arrest on the basis of Brown's assertion that Moorehead had tried to assault Brown.

Officer Koons did not ask Moorehead for his version of the encounter, and Moorehead did not volunteer any information. Koons also testified that he did not interview any other possible witnesses, including the store manager, because "any time you go on a scene and ask anybody 'Did you see anything,' everybody else says no."

Officer Koons admitted that his investigation had been precipitated by a report of an assault with a blackjack. The only person suspected of such an assault was, of course, Rodney Brown. Koons acknowledged that in assault cases he ordinarily questioned both parties, and not merely the suspect. In this case, he spoke only to Brown.

The former store manager, Darryl Washington, provided additional information regarding the police investigation. According to Mr. Washington, Rodney Brown

> stated that the gentleman had stolen something. The officer asked where was the stolen merchandise. Rodney stated that the gentleman had taken it out of the store and that he could not find it. The police officer stated something like, "Well, you've really done it

this time. You know this just won't stand." Then the officer stated to Rodney something like, "You better make the stolen merchandise appear in his bag."

Officer Koons later testified on deposition that he did not recall whether he suggested to Brown that Brown should charge Moorehead with assault.

## II.

Moorehead contends that the District is vicariously liable for Rodney Brown's alleged assault on him. The trial judge, as we have seen, granted the District's motion for judgment on the pleadings in connection with this claim. The majority affirms, apparently concluding as a matter of law, that Brown was not the District's agent. This conclusion is at least premature.

Motions for judgment on the pleadings are not favored. *Lambert v. Inryco, Inc.*, 569 F.Supp. 908, 912 (W.D.Okla.1980) (citations omitted). Such a motion should not be granted unless it appears beyond doubt, *i.e.*, to a certainty, that the plaintiff will be able to prove no facts in support of his claim which would entitle him to relief. *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir.1977); *Brown v. Bullock*, 194 F.Supp. 207, 228 (S.D.N.Y.), *aff'd*, 294 F.2d 415 (2d Cir.1961); *Austad v. United States*, 386 F.2d 147, 149 (9th Cir.1967). In this case, the District has not made the requisite showing.

Mr. Moorehead alleged in his complaint that "[d]efendant Brown is . . . an agent of the District of Columbia." To the extent that this is an allegation of fact, it must be taken as true for purposes of the District's motion for judgment on the pleadings. *See, e.g.*, *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985). "It has been generally held to be a question of fact for the jury whether, when a special police officer performs acts to which the master is sought to be held liable, he is acting in his capacity as a

servant *or as a public officer.*" *Colonial Stores, Inc. v. Holt,* 118 Ga.App. 826, 166 S.E.2d 30, 32 (1968) (internal quotation marks omitted) (emphasis added); *accord, Neallus v. Hutchinson Amusement Co.,* 126 Me. 469, 139 A. 671, 672 (1927). Although, in this case, the question is whether the SPO was acting as an agent of the District, the holdings of these cases are instructive by analogy.

This court has recently had occasion to articulate the standards for determining whether vicarious liability may be imposed:

> Whether an agency relationship exists in a given situation depends on the particular facts of each case. *District of Columbia v. Hampton,* 666 A.2d 30, 38 (D.C.1995). The factors to be considered include "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." *LeGrand v. Insurance Co. of North America,* 241 A.2d 734, 735 (D.C.1968), cited in *Hampton,* 666 A.2d at 38; *accord, Giles,* 487 A.2d at 611; *Safeway Stores, Inc. v. Kelly,* 448 A.2d 856, 860 (D.C.1982). Of these factors, the determinative one is usually "whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is done." *Le-Grand,* 241 A.2d at 735 (citation omitted); *accord, Hampton,* 666 A.2d at 38; *Levy v. Currier,* 587 A.2d 205, 209 n. 10 (D.C.1991); *Safeway,* 448 A.2d at 860; 53 Am. Jur. 2d *Master and Servant* § 2 (1970). The cases emphasize that the right to control, rather than its actual

exercise, is usually dispositive of whether there is an agency relationship. *See, e.g., Safeway,* 448 A.2d at 860.

*Judah v. Reiner,* 744 A.2d 1037, 1040 (D.C. 2000).

Applying the criteria set forth in *Judah* to Mr. Moorehead's allegations in this case, it does not appear "beyond doubt" that there was no agency relationship. Considering in turn the first, second, third, and fifth *Judah* categories, I note (1) that Brown was appointed to his position by the Mayor, *see* D.C.Code § 4–114 (1994); (2) that Brown's wages were paid by Rite Aid; (3) that the District retained the authority to revoke Brown's commission, 6A DCMR § 1104.1 (1988);[2] and (5) that arresting alleged shoplifters is part of the "regular business" of the District's law enforcement authorities.

I turn now to the "determinative" fourth *Judah* criterion, namely, whether the District had the right to control and direct Rodney Brown in the performance of his work. It is noteworthy that the District, as the moving party, submitted no affidavits or other materials tending to show that it lacked the authority to control its special police officers. In addition, apart from the District's failure to meet (or even attempt to meet) its factual burden, there is affirmative support for Moorehead's contention that a relationship of principal and agent exists. Special Police Officers are "subject to such general regulations as the Council of the District of Columbia may prescribe." D.C.Code § 4–114, and "amenable to the rules laid down for the government of the Metropolitan Police Force in so far as those rules are applicable." 6A DCMR § 1100.6.[3] The regula-

---

**2.** The Chief of Police was also authorized to recommend discipline against Brown. 6A DCMR § 1110.1.

**3.** Indeed, the Special Police Officer's Manual issued by the MPD's "Security Officers Management Branch" lists several grounds for suspension or revocation of an SPO's commission, including *"using unnecessary force in arresting or imprisoning any person* or being

discourteous toward any person or to the public." (Emphasis added.) A special police officer's commission may thus be revoked or suspended for the very kind of conduct that Moorehead alleges here. Another ground for suspension or revocation is "[f]ailure to obey orders or directives issued by the Chief of Police."

tions delineate an SPO's duties, *e.g.*, periodically checking doors and windows, etc., in the nature of a "watchman." § 1101.6. The District regulates the clothing that its Special Police Officers must wear, as well as the size and material of their badges. §§ 1109.1–1109.7. The District permits SPOs to carry firearms and other weapons, but strictly controls the times and places where such weapons may be carried. §§ 1103.3, 1103.4. Finally, the MPD's Manual for Special Police Officers includes provisions relating to the details of police procedure to be followed by SPOs, including the warnings to be given to suspected shoplifters, the steps to be taken upon the discovery of incriminating evidence, and, significantly, the appropriate and inappropriate use of a baton.[4]

According to the District,

the fact that SPOs—as is the case with other licensees in the District, e.g. architects, physicians, or accountants—are subject to disciplinary action by the respective Boards, *[s]ee* D.C.Code §§ 2-274, 2-3305.14, 2-115, does not render the District responsible for their professional activities.

My colleagues in the majority seem to agree with this reasoning, but I find the tendered analogy quite unpersuasive. Architecture, medicine and accounting are private activities which do not become public in nature simply because the District licenses practitioners. "Governmental li-

censing or extensive regulation of private activity alone does not warrant ascribing acts of the regulated entity to the state." *Woodward & Lothrop v. Hillary,* 598 A.2d 1142, 1146 n. 6 (D.C.1991) (citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972)). An SPO, on the other hand, "shall have the same powers as a law enforcement officer to arrest without warrant for offenses committed within premises to which his jurisdiction extends ...." D.C.Code § 23–582(a) (1996). Unlike, *e.g.,* architecture, arresting an individual is intrinsically a governmental function which falls within the police power of the state. "[S]pecial officers [therefore] act as agents or instrumentalities of the state in conducting searches and seizures incident to their power to arrest, and thus are subject to the restrictions of the Fourth Amendment." *Woodward & Lothrop, supra,* 598 A.2d at 1145.[5]

This court held in *Wade v. District of Columbia,* 310 A.2d 857, 863 (D.C.1973) (en banc), that "the District ... may be sued under the common law doctrine of *respondeat superior* for the intentional torts of its employees acting within the scope of their employment." In *Wade,* the employees were MPD officers who had allegedly assaulted the plaintiff and arrested him without probable cause. In the present case, the alleged employee was an SPO. Within the premises of the Rite Aid

---

4. Moorehead's attorney did not bring the Manual to the attention of the trial court. On a motion for judgment on the pleadings, however, it was the obligation of the District to establish beyond doubt that no agency relationship existed. I believe that we can and should take judicial notice of the Manual—an official publication of the MPD—at least for the limited purpose of showing that if the case had gone to trial. Moorehead could have presented significant evidence tending to show that the District had the right to exercise control over Brown's activities as an SPO. *See Poulnot v. District of Columbia,* 608 A.2d 134, 141–42 & n. 12 (D.C.1992). Dean Thayer put it well more than a century ago:

Courts may judicially notice much that they cannot be required to notice. That is well

worth emphasizing: for it points to a great possible usefulness in this doctrine, in helping to shorten and simplify trials.... The failure to exercise it tends daily to smother trials with technicality and monstrously lengthens them out.

JAMES THAYER, PRELIMINARY TREATISE ON EVIDENCE 309 (1898).

5. *District of Columbia v. Hampton,* 666 A.2d 30 (D.C.1995), cited by the majority, is distinguishable from the present case upon the same ground that I have distinguished situations involving architects, physicians, or accountants. The operation of a foster home, even an extensively regulated foster home, is not a state function in the sense that police activity is.

Pharmacy, however, Rodney Brown's position was analogous for all practical purposes to that of an officer of the MPD. Like a regular officer, Brown was authorized to make arrests without a warrant. Like the officers in *Wade*, Brown was accused of abusing that authority. *Wade* thus constitutes persuasive, though not dispositive, authority for reversal here.

In *Wells v. Washington Mkt. Co.*, 19 D.C. 385 (1890), the plaintiff, a customer at the Washington Market Company, was wrongfully accused of shoplifting, and he was arrested and handcuffed by one Capner. Capner was paid by the Washington Market Company to collect rents and to maintain order. Upon the application of the market company, Capner had also received an appointment from the Metropolitan Police Force as a special officer, with authority to make arrests. Like Brown in this case, Capner received no pay from any public source.

Following his detention, the plaintiff sued the market company for false arrest. The jury returned a verdict in the plaintiff's favor in the amount of $160. The Supreme Court of the District of Columbia reversed. The court entertained "no doubt that a great outrage upon this poor man was committed, and somebody ought to suffer for it." *Id.* at 389. The court held, however, that the market company was not liable, for Capner was not acting as the market company's agent when he arrested the plaintiff. On the contrary, according to the court, Capner effected the plaintiff's arrest in the exercise of his authority as an officer of the Metropolitan Police Force. Neither the fact of Capner's appointment to the force at the request of the market company, nor the market company's payment of his entire wages, made the arrest attributable to the market company. *Id.* at 397–98.

The *Wells* decision does not stand for the proposition that the plaintiff could recover damages from the District. Indeed, at the time *Wells* was decided, a suit against the District would surely have been barred by sovereign immunity. *See Wade, supra,* 310 A.2d at 860–63. The court's analysis in *Wells* strongly suggests, however, that an SPO such as Rodney Brown was just as much a state actor as a regular member of the MPD would have been, notwithstanding Rite Aid's role in applying for his appointment as an SPO and the market company's payment of his salary. Read together with *Wade, Wells* tends to support Moorehead's position.

In *Tezeno v. Maryland Cas. Co.*, 166 So.2d 351 (La.Ct.App.1964), the plaintiff's son was shot to death by Isadore, an employee of a movie theater, after the decedent had made a disturbance. According to the testimony of a police detective, Isadore was also a "special officer" of the City of Lafayette, apparently pursuant to an "honorary commission" issued by the Chief of Police. The plaintiff sued the City's liability insurer for wrongful death, alleging that the employee had used excessive force and that the City was vicariously liable for the "special officer's" conduct: The court held that

> the City of Lafayette could not be held to be responsible for the actions of Isadore, even though his acts may have been designed to maintain peace and order, unless the City had authorized or empowered him to perform the duties usually performed by policemen or peace officers for the City, including the power to make arrests.

*Id.* at 356. The *Tezeno* decision is not precisely in point with respect to the issue before us, but the passage that I have quoted does suggest that the actions of an SPO such as Rodney Brown, who did have the authority to make arrests, could fairly be attributed to the municipality that appointed him.

The question whether the District is vicariously liable for SPO Brown's actions is one of first impression in this jurisdiction. In my opinion, it should have been decided on a full factual record, and judgment on the pleadings was premature.

## III.

The trial judge granted summary judgment in favor of the District on Moorehead's claim that the police arrested and detained him without probable cause. My colleagues conclude that summary judgment was warranted. I do not agree.

The standard for summary judgment is a familiar one. In order to prevail on its motion, the District was required to demonstrate that there was no genuine issue of material fact and that the District was entitled to judgment as a matter of law. *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C.1994) (en banc). The court must view the record in the light most favorable to Mr. Moorehead, and draw all reasonable inferences in his favor. *Id.* Indeed, courts closely scrutinize the moving party's papers, while according "indulgent" treatment to the materials presented by the non-moving party. *See Fry v. Diamond Constr., Inc.*, 659 A.2d 241, 246 (D.C.1995) (citations omitted). The District cannot prevail under this exacting standard.

The trial judge concluded, as a matter of law, that Officer Koons had probable cause to arrest Mr. Moorehead. To sustain this defense, an arresting officer (or, here, the District, which stands in the officer's shoes) must prove that the officer had a reasonable good faith belief that Moorehead committed the offense. *Safeway Stores v. Kelly*, 448 A.2d 856, 862 (D.C. 1982). Unless probable cause is shown to exist as a matter of law, the issue should ordinarily be left to the jury. *See District of Columbia v. Murphy*, 631 A.2d 34, 37 (D.C.), *reaff'd on rehearing*, 635 A.2d 929 (D.C.1993).

"An arresting officer is required to conduct a reasonable investigation to establish probable cause." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir.), *cert. denied*, 525 U.S. 823, 119 S.Ct. 67, 142 L.Ed.2d 52 (1998) (quoting *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir.1989)). In order for probable cause to exist, an arrest must be "objectively reasonable under the totality of the circumstances." *Id.* "Where it would appear to a cautious man that further investigation is justified before instituting a proceeding, liability may attach for failure to do so." *Id.* at 1435–36 (citation omitted). The defense of probable cause may be "overcome by evidence that false testimony was the basis of the charge and that the falsity, if so, was discoverable upon reasonable investigation." *Moad v. Pioneer Fin. Co.*, 496 S.W.2d 794, 799 (Mo. 1973) (citing *Kvasnicka v. Montgomery Ward & Co.*, 350 Mo. 360, 166 S.W.2d 503, 510 (1942)). "In this land of freedom of liberty, with all of its concomitant constitutional rights and protections, if we wish to have our citizen population continue to respect the authority of police personnel performing their duties in a lawful manner, it is incumbent on law enforcement officials to make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest and detention." *Moore v. The Marketplace Restaurant*, 754 F.2d 1336, 1346 (7th Cir.1985).

In *Moore*, the plaintiffs were arrested in the middle of the night after the manager of a restaurant reported to the police that the plaintiffs had left the establishment without paying for their meal. Before arresting the plaintiffs, the police officers went to the restaurant and interviewed the manager, but they conducted no other investigation. In their complaint for false arrest, the plaintiffs claimed that they had been harassed by the restaurant's personnel, that they had waited for two hours for a meal that never arrived, and that they had unsuccessfully attempted to pay for their drinks before leaving the restaurant. They alleged that the police had failed to elicit available evidence pointing to their innocence and had arrested the plaintiffs without probable cause. The trial court granted summary judgment in favor of the county. The Court of Appeals reversed. The court concluded that there was a genuine issue of material fact regarding the sufficiency of the police officers' investigation, and that summary judgment was unwarranted:

This entire episode may have been avoided if the officer who received the original complaint and the arresting officers had used reasonable judgment and conducted a proper investigation.

\* \* \* \* \* \*

[U]nder the circumstances of this case it is proper for the jury to consider all the evidence, including questions regarding the sufficiency of the deputies' investigation at the scene, in determining whether there was enough evidence to establish probable cause to arrest for the crime of theft of services.

*Id.* at 1345–47.

I turn now to the present case. When Officer Koons arrived on the scene, Mr. Moorehead was bleeding from the head and severely injured. Koons suspected that Brown had used excessive force, and he considered arresting Brown as well as (or instead of) Moorehead. Nevertheless, and relying solely on Brown's account, Koons exercised his "awesome power," *id.* at 1346, to arrest Moorehead.

Even discounting the manager's Rule 60(b) affidavit, see Part IV, *infra*, I believe that, at the very least, a jury question was presented regarding the reasonableness and sufficiency of Officer Koons' investigation. Rodney Brown, as I have noted, was much taller, far heavier, and several years younger than Mr. Moorehead. Brown was armed at least with a baton. So far as the record shows, Moorehead was not armed at all. Under the circumstances, it would have been foolhardy at best for a small,

unarmed, middle-aged man to assault a powerful armed adversary, especially one with police powers. Moreover, Moorehead had obviously been badly beaten and seriously hurt, while Brown sustained no injury.[6] Officer Koons was thus confronted with an account from Brown which ought to have generated skepticism in a reasonable police officer. At the very least, an impartial jury could so find.[7]

Moreover, like the officers in *Moore*, Officer Koons made no investigation beyond obtaining SPO Brown's account. Although the police had been called to the scene in connection with an assault with a blackjack, Koons never interviewed the victim of that alleged assault.[8] By his own admission, Koons likewise failed to interview either the store manager or any customers, professing to believe that witnesses usually claim not to have any knowledge of the events that have transpired. This curious explanation, if taken seriously, suggests that questioning of independent witnesses is futile and that Officer Koons does not bother with it. Viewing the record in the light most favorable to Mr. Moorehead, I cannot agree that Koons' investigation was reasonable as a matter of law or that there was no genuine issue of material fact for a jury to decide.

This case is quite unlike *United States v. Simpson*, 330 A.2d 756 (D.C.1975), cited by the District, in which this court sustained a finding of probable cause on the basis of the complainant's statement to the police. In *Simpson*, the complainant, Vines, told

---

6. Although Brown claimed that his clothes were mussed. Moorehead later swore that he was struck from behind and that he offered no resistance at all.

7. In fact, Koons' deposition reveals that he *was* skeptical about Brown's conduct.

8. According to the majority. "Moorehead was present when Koons was talking with Brown and had plenty of opportunity to present his side of the story." But especially if one views the record, in conformity with summary judgment principles, in the light most favorable to Moorehead, this "opportunity"

was more illusory than real. At the relevant time. Moorehead was in handcuffs and in the presence of the SPO who had just beaten him into semi-consciousness. That SPO had told him that "I am the police," and Officer Koons was siding with Brown by arresting Moorehead but leaving Brown at liberty. The situation, in other words, was a frightening one for Mr. Moorehead. An impartial jury could properly find it to be unreasonable for Officer Koons, under these circumstances, to expect the victim of the alleged beating to volunteer information when nobody had asked him for his account or expressed any interest in his side of the story.

the police that Simpson had pointed a gun at Vines and had threatened to kill him. *Id.* at 757. The officer found Vines to be credible, and, as this court noted, "he prudently anticipated that the erstwhile armed assailant might be dangerous." *Id.* at 758. Moreover, "a departure by the police to seek a warrant needlessly could have endangered Vines," *id.* n. 4, and it was therefore important for the police to take Simpson into custody promptly. In the present case, the suspect, Moorehead, was already handcuffed, on the ground, and nursing his wounds following his involuntary encounter with SPO Brown's baton. Each case turns on its own circumstances, and the significant factors in *Simpson*— the dangerousness of the suspect and the consequent need for a prompt decision to arrest—are simply absent here.

### IV.

On August 2, 1996, the trial judge granted summary judgment in favor of the District on Mr. Moorehead's claim that he was arrested without probable cause. On August 19, 1996, Moorehead's attorney filed a motion for reconsideration purportedly based on Super. Ct. Civ. R. 59(e), but actually cognizable under Super. Ct. Civ. R. 60(b).[9] In support of his motion, counsel filed the affidavit of Darryl Washington (the manager of the pharmacy at the time of Moorehead's arrest) from which we have quoted at p. 151, *supra.* According to Mr. Washington, a police officer advised SPO Brown, in effect, to cover up Brown's own misconduct by planting evidence in Moorehead's bag. Washington stated that this episode "made me lose some faith in the justice system."

The trial judge denied Moorehead's motion upon the following grounds:

> Plaintiff fails to show that he exercised due diligence in attempting to discover this evidence in time to respond to Defendants' motion for summary judgment

and such evidence does not create a genuine issue of material fact in dispute.

In my opinion, neither of the court's stated reasons can withstand critical scrutiny in light of the record in this case.

The contents of Mr. Washington's affidavit are quite remarkable. This affiant, after all, was not Mr. Moorehead's confederate in any shoplifting venture. On the contrary, if Moorehead was a thief, then Mr. Washington and his employer were Moorehead's victims. Yet Washington— the person at whose request the police had been called—reported that a police officer had counseled an SPO who had grossly abused his authority to plant evidence on the SPO's victim in order to save the SPO's own skin. An impartial juror who credited this testimony would surely entertain grave doubt as to whether an officer who dispensed this disgraceful and sordid advice was acting reasonably and in good faith when he arrested Moorehead—the very person whom he was advising the SPO to frame. The affidavit was therefore highly probative, and at least potentially destructive of the probable cause/good faith defense.

"Rule 60(b) is to be given a liberal construction so as to do substantial justice and to prevent the judgment from becoming a vehicle of injustice." *MIF Realty L.P. v. Rochester Assocs.,* 92 F.3d 752, 755 (8th Cir.1996) (citation and internal quotation marks omitted). The Rule was intended "to preserve the delicate balance between the sanctity of final judgments . . . and the incessant command of a court's conscience that justice be done in light of all the facts." *Good Luck Nursing Home, Inc. v. Harris,* 204 U.S.App. D.C. 300, 305, 636 F.2d 572, 577 (1980) (citations and internal quotation marks omitted).

In ruling on Rule 60(b) motions, courts apply equitable principles, and

*Fleming v. District of Columbia,* 633 A.2d 846, 848–49 (D.C.1993) (citations omitted).

---

9. Because Moorehead presented new material for the court's consideration, the motion is properly analyzed under Rule 60(b). *See, e.g.,*

[o]ne important equitable consideration is whether the litigants received a ruling on the merits of their claim. "There is much more reason for liberality in re-opening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits...." In such cases, we must balance the policy favoring finality in judgments against the competing policy of granting parties a hearing on the merits of their claims. *MIF Realty, supra,* 92 F.3d at 755 (citing 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2857, at 256–57 (2d ed.1995)). The present case was disposed of on the basis of pretrial motions before the first witness was called, and the considerations favoring finality are thus far less compelling than they would be if the motion had been filed in the wake of a full trial on the merits. Under these circumstances, "the incessant command of [the] court's conscience," *Good Luck Nursing Home, supra,* 204 U.S.App. D.C. at 305, 636 F.2d at 577, counsels against a grudging application of Rule 60(b). Rather, we should construe the Rule liberally to prevent injustice. *MIF Realty, supra,* 92 F.3d at 755.

With these considerations in mind, I turn to the trial judge's determination that Moorehead's attorney failed to exercise due diligence in securing Mr. Washington's affidavit. The relevant facts are undisputed, and in my view they dispel any notion that counsel sat on his hands or fiddled while Rome burned. On the contrary, once the complaint had been filed, counsel devoted considerable time and effort to the task of locating Mr. Washington, who was no longer employed at Rite Aid, and who had moved from his previous address. Indeed, given that nobody appeared to know where Mr. Washington was,[10] Moorehead's attorney located him fairly promptly. The

following chronology reflects the relevant facts:

**December 7, 1994** Mr. Moorehead arrested and beaten. Mr. Washington provides police with statement describing his observations.

**November 13, 1995** Complaint filed.

**April 9, 1996** Counsel for plaintiff receives Brown's answers to interrogatories, which disclose that Mr. Washington was in the store during the incident. Brown's answers disclose the telephone number of Washington's grandmother, but according to the grandmother, Washington's whereabouts are unknown.

**May 1, 1996** Plaintiff serves notice on defendant Rite Aid directing that said defendant produce Mr. Washington for deposition.

**May 17, 1996** Through discovery, counsel for plaintiff receives Mr. Washington's statement to the police, which includes Washington's last known address.

**May 30, 1996** Counsel for Rite Aid advises counsel for plaintiff that Mr. Washington no longer works for Rite Aid. Counsel for plaintiff retains an investigator who makes several visits to Mr. Washington's last known address, but is unable to locate Mr. Washington.

**June 28, 1996** District of Columbia files a motion for summary judgment.

**July 31, 1996** Counsel for plaintiff mails letter to Mr. Washington at his last known address.

**August 5, 1996** Mr. Washington calls plaintiff's counsel.

**August 6, 1996** Trial court grants summary judgment in favor of the District.

**August 7, 1996** Plaintiff's counsel meets with Mr. Washington.

---

10. Rodney Brown testified on deposition that Mr. Washington was suspected of stealing money from his employer, and Mr. Moore- head's attorney suspected that Washington might be "on the lam."

**August 16, 1996** Mr. Washington signs affidavit.

**August 19, 1996** Plaintiff files motion for reconsideration.

In my opinion, the notion that counsel's efforts, as outlined above, were so lacking in diligence that Washington's affidavit should be excluded simply cannot be reconciled with the authorities construing Rule 60(b). If the affidavit is included in the probable cause/good faith calculus, then, in my view, the award of summary judgment in favor of the District on the probable cause/good faith issue becomes completely untenable.

### V.

For the foregoing reasons, I would reverse the judgment and permit Moorehead to present his case to a jury.